IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARIA H. HELM               :        CIVIL ACTION
                            :
        v.                  :
                            :
MATRIX SVC. INDUS. CONTRACTORS  :     NO. 07-4622

MEMORANDUM

Dalzell, J.                              November 12, 2008

Plaintiff Maria Helm sued her former employer, Matrix Service Industrial Contractors, Inc. ("Matrix"), for employment discrimination under Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act.[1] Specifically, Helm brought sex discrimination claims for disparate treatment, retaliation, and a hostile work environment.

Matrix has moved for summary judgment, and Helm moved for partial summary judgment regarding two of Matrix's defenses. Because we will grant Matrix's motion for summary judgment, we will deny Helm's motion for partial summary judgment as moot.

_____

[1] Because Pennsylvania courts have interpreted the Pennsylvania Human Relations Act interchangeably with Title VII, our analysis is the same under these two statutes. Weston v. Pennsylvania, 251 F.3d 420, 426 n.3 (3d Cir. 2001). For ease of readability, we will refer to Title VII throughout this opinion, but our findings and analysis are the same under both statutory schemes.

## I.  Factual Background

As is so often the case in employment litigation, the analysis of the claims at issue is necessarily fact intensive. Here the record is such that we must canvass it at length.

### A.  The Plaintiff, Maria Helm

Maria Helm has worked in construction for twenty years, in particular as an electrician since 1992.  Helm Written Stmt., Pl. Opp. to Def. Mot. Summ. Judg. ("Pl. Opp.") App. Ex. B ("Helm Written Stmt.") at 1.  Helm is one of few women working "in the trade," and "the respect of the men is crucial" to her success. Id. at 6-7.  She is a member of the International Brotherhood of Electrical Workers Local 351 (the "Union"), which provides electricians to Matrix for its work at the PSEG Salem Nuclear Generating Facility in Lower Alloway Creek, New Jersey (the "Site").  Id. at 1; Shimp Dep., Def. Mot. Summ. Judg. Ex. ("Def. Ex.") A ("Shimp Dep.") at 10-12.

The incidents leading to this lawsuit occurred during Helm's employment at the Site from August 14, 2006, to January 11, 2007, when Matrix laid her off.  Helm Timeline, Pl. Opp. Ex. D ("Helm Timeline").  Helm was forty-one years old and was the only woman working at the Site at the time of her layoff.  Helm

-2-

Written Stmt. at 7; Helm Dep. at 149.  Since then, the Union,
which chooses the member electricians to send to employers, has
not sent her back to Matrix.  Helm Written Stmt. at 5; Helm Dep.
at 30-31.

Helm believes she "was laid off because of [Matrix
supervisor] Phil Lynch, and in turn, that is because of [her]
gender, [her] sex." Helm Dep. at 186.  Helm's interactions with
Lynch, which we discuss in detail below, have "affected [her]
career, [her] family and [her] respectability." Id. at 170.  She
also expresses concern that her treatment at Matrix will keep
other women from choosing to work as electricians.  Helm Written
Stmt. at 8.

### B.   The Hiring And Hierarchy Of Union Electricians

As is common in the construction industry, Matrix hires
and lays off its Union workers in a cyclical pattern.  Helm
Written Stmt. at 6.  See Def. Ex. L.[2] As projects ramp up, Matrix
hires more electricians.  When the work ebbs, it lays them off.
Matrix 1st Resp. to EEOC, Pl. Opp. Ex. I ("1st EEOC Response") at
2; Matrix 2d Resp. to EEOC, Pl. Opp. Ex. G ("2d EEOC Response")

---

[2] On some records, such as this exhibit, Matrix is
identified as "Bogan." The two words refer to the same company.
Helm Written Stmt. at 1.

at 3, 5.  Indeed, before the time at issue in this case, Matrix
laid off Helm several times due to a lack of work, and only one
of those layoffs was voluntary.  Helm Dep. at 31-33.  Helm
concedes that her previous involuntary layoffs were "absolutely
not" motivated by sex discrimination.  Id. at 34.  Indeed, the
governing collective bargaining agreement contemplates layoffs,
and under it if Matrix lays off Union electricians it cannot call
the Union to hire new electricians for two weeks.  Id. at 155.

When Matrix needs to hire electricians from the Union,
it tells the Union how many people Matrix needs with certain
skills, and the Union generally chooses who to send through its
internal referral procedure.  1st EEOC Response at 3; Inside
Agreement of the Southern Division of the Southern New Jersey
Chapter, Inc. National Electrical Contractors Association and
Local Union 351, International Brotherhood of Electrical Workers,
Def. Ex. B ("Inside Agreement") at Article IV.  The Union always
chooses which journeymen electricians to send on a job.  Helm
Dep. at 26-27, 29-30; Shimp Dep. at 115. Ivan Shimp, Matrix's
full-time general foreman at the Site, decides who among the
journeymen electricians becomes the foreman on a particular job.
Shimp Dep. at 13.  See also 1st EEOC Response at 3.  Matrix can
request a specific general foreman, but Shimp does not believe

-4-

Matrix has ever called the Union to request a different general
foreman.  Shimp Dep. at 115-17;  Inside Agreement at § 3.7.  Helm
states that she heard that Matrix is able to request specific
workers to be supervisors, foremen, or general foremen, but she
is unaware of Matrix ever making such a request.  Helm Dep. at
26-28, 33.  Finally, Matrix has a right to refuse to hire someone
from the Union but has never done so.  Shimp Dep. at 12; Inside
Agreement at §4.3.

    Among the electricians on the site, journeymen
electricians do the physical work and are the lowest in the
hierarchy.  Helm Dep. at 38.  The Union has four categories of
journeymen electricians, based primarily on experience, but all
have at least one year's work experience in the trade.  Inside
Agreement at § 4.5.  Foremen supervise a particular job and
directly oversee the work of journeymen electricians.  Helm Dep.
at 38-39.  As general foreman, Shimp chose which journeymen
electricians would be foremen for each job.  Shimp Dep. at 13,
25.  General foremen supervise a number of jobs and the foremen
running those jobs.  Helm Dep. at 40-41.

    Helm was briefly the general foreman for the night
shift at Matrix.  Id. at 47; Helm Timeline.  As general foreman,

Shimp worked under supervisors Phil Lynch and Jim Shoeman.[3] Shimp Dep. at 24-25.  Together with site manager Al Maginski, Shoeman was Lynch's supervisor.  Id. at 41-42.  Helm also worked for supervisor Chris Simon, who usually was a night-shift supervisor. Helm Dep. at 111.  Although Helm had concerns about Lynch and Shoeman, she liked working for Simon.  Id. at 111.  Al Maginski was the Matrix site manager at the Site and oversaw Lynch, Shoeman, and everyone below them.  Shimp Dep. at 23-24.

### C.   Matrix's 2006-07 Employment Of Helm

Helm's most recent work with Matrix began on August 14, 2006.  Helm Written Stmt. at 1-2; Helm Timeline.  Until her layoff on January 11, 2007, she worked as a foreman or journeyman electrician on various jobs and was general foreman for the night shift for about three weeks.  Helm Timeline.  She was the first woman to be named general foreman for the night shift.  Helm Written Stmt. at 2.  Matrix has not appointed any women to be foremen since it laid off Helm.  Shimp Dep. at 41.  Shimp selected Helm to be a foreman because "[s]he did an adequate job," but he was disappointed in her because she put her head

_____

[3] In some documents filed with the Court, Shoeman's name is spelled "Shuman."

down and did not participate in meetings.  Id. at 31, 33.
Maginski and Shoeman complained to Shimp about this issue as
well. Id. at 35-37.  Shimp also said Helm was "short-tempered"
and "snappy."  Id. at 33.  However, he was generally pleased with
her supervision of other electricians while she worked as a
foreman.  Id. at 34.

After Union electrician Robert Diggs started working
for Matrix, and in response to two queries from Shimp on as many
occasions, Diggs told Shimp that he did not have a problem
working for a female foreman, nor did he have any problems with
Helm in particular.  Diggs Aff., Def. Ex. K ("Diggs Aff.") at 1-
2. Shoeman also asked Diggs if he had any problems with Helm, and
Diggs replied that he did not.  Id. at 2.  Diggs thought Shoeman
was "trying to get dirt on Ms. Helm."  Id.  Diggs worked for Helm
while she was a foreman and found her to be competent; in fact,
he thought she was better than most of the other foremen at the
Site. Id.

### D.   Helm's Interactions With Supervisors Lynch And Shoeman

Lynch was the primary source of Helm's perception of
discrimination and is the only Matrix employee identified in

Helm's complaint as one who harassed her.[4]  Helm Dep. at 8-10;
Compl. ¶ 21-23.  Helm met Lynch in September of 2006, shortly
after she began working at Matrix.  Helm Dep. at 50.  She
remembers him being "really quiet" and just sitting at the
computer during this first encounter.  Id. at 51.  From this
innocuous beginning their relationship soured.  Helm now believes
that Lynch "hate[d her] because of [her] chosen path [which was
nontraditional for a woman], [her] sex and [her] personality."
Id. at 170, 172.

     Helm and Lynch first formally worked together around
November of 2006, when Lynch was supervising the day shift crew
for a short job on which Helm supervised the night crew.  Id. at
52, 56-57.  On the first night of this two-night job, Lynch told
Helm that there was no work for her night-shift crew and that
they should go home, but the day-shift crew was working more than
twelve-hour shifts.  Id. at 52-63.  Helm believed that Lynch was
"hoarding [the work] for his crew."  Id. at 53.  After a phone
call to Maginski, Helm's crew worked, though the hours were still
minimal. Id. at 59-62.

_____

        [4] In her deposition, Helm said that Shoeman began to be
unfriendly toward her in December of 2006. Helm Dep. at 8-10. We
will discuss this infra.

                              -8-

Lynch became Helm's supervisor while she was the night-shift foreman for the "jet job" at the Site.  Id. at 69.  See also Shimp Dep. at 38-39.  Before Shimp formally named her to that position, Helm believed she would be foreman because she was discussing the job and learning about it while working on the jet job day shift; during this time, Lynch attempted to name a man as jet job foreman. Helm Dep. at 69-70, 73-79.  Lynch approached two of Helm's male co-workers regarding the jet job foreman position, and both of them turned it down because they knew that Helm was going to be the foreman and that Lynch could not pick the foreman for a job. Id. at 71.  Shimp and Helm agree that Lynch did not have the authority to choose someone to act as foreman.  Id. at 69-70; Shimp Dep. at 42. Shimp intervened in Lynch's machinations, and Helm was made the jet job foreman.  Helm Dep. at 69-71, 75; Helm Written Stmt. at 3; Helm Typed Statement, Pl. Opp. Ex. E ("Helm Typed Stmt.") at 2.  Helm has cited no evidence that Lynch influenced Shimp in his selection of her as foreman. See Helm Dep. at 80.

After this conflict about the jet job foreman position, co-worker Randy Ramey told Helm that Lynch "is a snake, not well liked in Pennsylvania, and Hates women in the trade."  Helm Written Stmt. at 2. See also Helm Typed Stmt. at 1; Helm Dep. at

-9-

64-69, 76.  Ramey based this opinion on his lengthy experience with Lynch but did not give Helm any facts to buttress his statement.  Helm Dep. at 67.  Notably, this conversation with Ramey regarding Lynch's dislike of women is the <u>sole</u> basis Helm identified to the EEOC for her belief that she was laid off because of her sex. <u>Id.</u> at 187-88.

Helm claims she told Shimp about Lynch's attempt to preempt her appointment as jet job foreman and what she had heard about Lynch's view of women, and Shimp testified this was news to him.  <u>Id.</u> at 71, 74-75; Helm Typed Stmt. at 2.  Shimp does not remember this conversation and says that other men or women have not complained to him about Lynch. Shimp Dep. at 48-49, 100. Shimp also only remembers one "suggestion" that Lynch made to him about Helm, which involved the consistency of the color of highlighters electricians were using to track their work. Shimp Dep. at 37-38. Nonetheless, five or six times Helm's co-worker Diggs heard Helm complain to Shimp about Lynch, but Diggs did not specify the nature of these complaints (<u>e.g.</u>, whether they regarded sex discrimination or more general worker-employer concerns). Diggs Aff. at 2. Diggs thought Lynch was trying to "knock Ms. Helm down." <u>Id.</u> at 2.

-10-

Lynch also tried to interfere with Helm's relationship with Shimp by making false complaints about her and her crew. For example, while Helm was filling in as foreman on the "sump job," Lynch, who was supervisor for that job, told Shimp that Helm's team was not in their work areas. He also "hound[ed]" them regarding lunch and other breaks. Helm Written Stmt. at 4; Helm Dep. at 101-105; Helm Typed Stmt. at 2. On one occasion, Shimp thought Helm had let her team go to lunch early. Instead, Helm had sent them to look for materials close to lunch time and on their way to lunch. Helm Dep. at 103. Helm explained this to Shimp and thought he accepted her explanation. Id. 105. Of all the foremen at Matrix, Helm was the only foreman treated this way. Helm Written Stmt. at 4.

On another occasion, Helm was a journeyman electrician on a job putting bullet-resistant enclosures on the roof of a building at the Site. Lynch was also supervising that job and called Shimp to say he couldn't find Helm. In fact, "he never really looked" for her. Helm Typed Stmt. at 2. See also Helm Dep. at 81-90, 100. Helm does not know why Lynch was looking for her but believes he simply wanted to cause trouble for her with Shimp. Id. at 87-88.

Finally, Lynch embarrassed Helm in January of 2007[5] while she was working as a journeyman electrician on the "A Building job,"[6] by asking Helm's partner, Mike Tomaglio, "How is your helper [referring to Helm] working out for you?" Helm Typed Stmt. at 2. As a result, Helm felt humiliated and embarrassed in front of her co-workers. Helm Written Stmt. at 5; Helm Dep. at 91-96. Helm "retaliated by saying something smart back to him." Helm Typed Stmt. at 2. When Lynch walked away, Helm "told him to wipe that stuff off his chin" in reference to "a long-standing joke that he was under the desk of one of the [male] Matrix . . . bosses." Helm Dep. at 91-92.[7] The "stuff" Helm referred to was sperm. Id. at 117. Helm yelled out her comment when Lynch was 40-50 feet away and is not sure whether he heard her. Id. at 118,

_____

[5] Helm gives different dates for this exchange. It either happened on January 2, 2007, or two days before she was laid off (January 9, 2007). Cf. Helm Dep. at 98 and Helm Written Stmt. at 4-5.

[6] Lynch was not the supervisor on the A Building job. Helm Dep. at 100.

[7] Shimp said that he heard Helm's retort for the first time during her deposition. At his own deposition, Shimp said that he was not offended by her comment: "It's a construction site. Things like that are said on occasion. It's a little odd coming from a lady. Does it surprise me? No. Does it offend me? No. I'm a construction worker. You've got to go a lot harder than that to offend me." Shimp Dep. at 148-49.

182. Although Helm categorized her comment about Lynch's chin as a joke and said that joking regularly happens on the job site, she experienced Lynch's "helper comment" as a deliberate insult. Id. at 91-94. Helm told everyone in the lunch area about this exchange and believes Shimp was there, but she did not speak directly to Shimp about this incident. Id. at 97-98.[8]

Jim Shoeman, Lynch's colleague and supervisor, is the only other Matrix employee about whom Helm has complained in this case. Helm thought that Shoeman's demeanor toward her changed in December of 2006 and that he was unfriendly towards her about a half dozen times. Id. at 11-13. Helm believes that Lynch said something to Shoeman that caused this change, but she has no evidence that Lynch and Shoeman talked about her during that period. Id. at 15-17. Shoeman told Helm's co-worker Wayne Harris that Helm has a "big mouth"[9] and would not be back to the Site as

---

[8] Matrix denies Helm's allegations regarding Lynch and found no evidence of Lynch's alleged misbehavior in its own investigation. 2d EEOC Response at 2. In a written statement submitted to the EEOC, Lynch said he never criticized, complained about, embarrassed, or undermined the authority of Helm. Id. at 6.

[9] Before she heard this report from Harris, Helm had never heard the phrase "big mouth." Helm Dep. at 24-25. Because this is summary judgment, we must take the facts in the light most favorable to the plaintiff and believe that Helm had never
(continued...)

a foreman.[10] Id. at 18-19. Lynch was present when Shoeman made

these remarks. Id. at 21.  On another occasion, Shoeman also told

Shimp that Shimp, too, had a "big mouth", and Shoeman played no

part in determining which electricians work for Matrix. Shimp

Dep. at 94-95.  Helm admits that Shoeman did not do anything else

that led her to believe Matrix discriminated against her because

of her gender or retaliation. Helm Dep. at 35.

### E.   The A Building Job and Helm's Layoff

On January 2 or 3, 2007, Helm started work as a

journeyman electrician on the A Building job, which was a

renovation project. Helm Timeline, Pl. Opp. Ex. F at 3[11]; Shimp

Dep. at 54. Matrix added three "additional guys" to the A

---

[9] (...continued)
heard this phrase. But see The Princess Bride (Twentieth Century
Fox Film Corp. 1987) (Vizzini: He didn't fall? Inconceivable.
Inigo Montoya: You keep using that word. I do not think it means
what you think it means.).

[10] Again, Matrix (like all employers covered by the
Inside Agreement) has the power to refuse to hire a Union member,
but it has never done so.

[11] In her written statements Helm gives conflicting
dates for when she began working on the A Building job. Most
often, she states that it was January 3, 2007, but in at least
one place she claimed that it was January 2, 2007. Helm Written
Stmt. at 4. This one-day difference has no impact on our
analysis.

Building job on January 9. After her confrontation with Lynch regarding his helper comment on January 8 or 9, 2007,[12] Shimp decided that Helm would be foreman on the A Building job. Helm Written Stmt. at 5; Helm Timeline; Helm Dep. at 109-110. Helm learned this from Shimp and Joe Hall, who was the original foreman on the A Building job. Helm Dep. at 106-07. See also Shimp Dep. at 71-72. Lynch again attempted to name someone else as foreman. Helm Dep. at 108. Tom Green actually became the foreman on the A Building job on January 10, 2007, just one day before Helm's layoff. Helm Timeline. There is no evidence that Lynch had any input in naming Green to be foreman on the A Building job.

On January 11, 2007, Shimp told Helm that Matrix was laying her off. Helm Timeline. Shimp did not tell Helm why she was on the layoff list, and she did not ask him at that time or after her layoff. Shimp Dep. at 115-116. On that day, six "men" left the job (five males and Helm). In addition to Helm, Matrix transferred two of the men to other positions within the company, involuntarily laid off two, and laid off a sixth person who asked to be laid off. Helm Written Stmt. at 5; Helm Dep. at 130.

---

[12] Plaintiff's exhibits again provide inconsistent dates.

Helm told Shimp that she was available to be transferred to another Matrix facility, but Shimp checked with "supervision" and told her it was not possible to transfer her because there were no more transfers available. Helm Dep. at 125-27. The two men Matrix transferred had skills and qualifications that Helm did not have.  Matrix transferred Ramey (the man who warned Helm about Lynch) to another job in New Jersey. Helm Typed Stmt. at 1. Ramey is a highly sought-after welder with outstanding skills, and offering him a transfer is "almost an automatic" decision. Shimp Dep. at 85. Helm agreed that Ramey is "a great welder," and Helm does not have a welding certificate Helm Dep. at 124. Matrix also transferred Craig Hopely to the Valero Refinery. Helm Typed Stmt. at 1. To work at a refinery like Valero, electricians have to have a South Jersey chemical card. Shimp Dep. at 83-84. When Shimp considers transferring people to one of the refineries, he asks if they have a chemical card; if one does not, she or he is generally barred from transferring to a refinery. Id. at 83-84. At the time Matrix laid off Helm, her chemical card was expired, but she was able to renew it the next week with a two-hour class. Helm Dep. at 127-28. Helm said that refineries typically send an employee with an invalid chemical card to the two-hour class if the refinery

-16-

really wants that employee. Id. at 127-28.  However, Matrix does
not wait for employees with lapsed cards to take a class for
reinstatement because the company only hires refinery
electricians who can report to work right away. Shimp Dep. at 84-
85.

### F.   Matrix's Reasons For Laying Helm Off

Matrix said that it laid off Helm "due to lack of work"
and because of "discontinuance of our work in that section of the
Salem Nuclear Generating Facility." 1st EEOC Response at 2. See
also Def. Resp. to Pl. 1st Inter., Pl. Opp. Ex. J at 2. According
to a response Matrix filed with the EEOC, Matrix "laid off...all
electricians who were associated" with the project on which Helm
was working. 1st EEOC Response at 2. Helm claims she was the only
electrician Matrix laid off from the A Building job. Helm Typed
Stmt. at 1; Helm Dep. at 122.

Helm and Shimp both disagree with Matrix's contention
that work ended in the sector where Helm was working.  In his
deposition, Shimp said Matrix had a problem getting light
fixtures for the A Building and that he did not add people to the
A Building job. Shimp Dep. at 59-61.  However, in contrast with
the company's statements to the EEOC, Shimp said that work

-17-

continued ("barely") in the A Building and that Matrix completed that job <u>after</u> Helm's layoff.  <u>Id.</u> at 72-73, 114.  He also said that there was some work available at the Site in general.  <u>Id.</u> at 109-110.  Helm also claims the A Building job continued after her layoff. Helm Written Stmt. at 5-6; Helm Dep. at 119. Helm's co-worker Wayne Harris told her that the A Building job "never skipped a beat."  Helm Dep. at 121-122. Indeed, employment records show that work did continue on that job. For example, Wayne Harris, Michael Moore, Michael Taimanglo, Martin Trapp, and Thomas Green (who became foreman instead of Helm) -- all men -- worked on the A Building job both before and after Matrix laid off Helm. Pl. Opp. Ex. F.[13]

But Matrix acted similarly regarding the jobs of Dennis Abriola and Tim Riley, the two men Matrix involuntarily laid off with Helm. Shimp Dep. at 64. According to time sheets, prior to

---

[13] Furthermore, Matrix added the following workers, all of whom appear to be male, to the A Building job after Helm's termination: Roger Riggins on January 15 (for only two days), Lee Powers on January 15, Joseph Menardy on January 22, Jason Knecht on January 25, Kenneth Furr on February 2, Joseph Mardi on February 6, William Jones on February 7 (each for one day), Howard Trumbetti on March 8, Kenneth Gallagher on March 27, Joseph McMichael on March 27 (for one day), and Jason Hentz and Edward Reiser on April 3 (for one and two days, respectively). Pl. Opp. Ex. F. As general foreman, Shimp also logged hours on the A Building job from January 1 through March 5, 2007.

the layoff Riley and Abriola worked on a project entitled "PSEG-SALEM I & II BRE POW." Def. Ex. J at 7, 12. After January 11, 2007, three employees did additional work on this project despite the fact that Matrix laid off Riley and Abriola (like Helm) for lack of work. Id. However, Matrix employees did significantly less work post-January 11, 2007, on the PSEG-SALEM I & II BRE POW project than on the A Building job. Compare Def. Ex. J with Pl. Opp. Ex. F.

In its EEOC filing, Matrix also claimed that it "had been notified by the client, that they would be taking over the supplemental work we were performing at the [Site] and that we would no longer need to support work in that area of the station." 1st EEOC Response at 2. Shimp flatly contradicted this statement and said that Matrix had never "worked hand-in-hand" with the client. Shimp Dep. at 111. However, at some point, the client employing Matrix at the Site gave most of Matrix's work to another contractor. Id. at 111.

Helm was also surprised to be laid off because typically journeymen electricians are laid off before foremen. Helm Written Stmt. at 6. But Helm and Shimp agree that Helm was a

journeyman electrician and not a foreman at the time of the
layoff. Shimp Dep. at 99; Helm Dep. at 167.[14]

 The local Union representative initially expressed
surprise that Matrix laid Helm off and thought she must have
volunteered for the layoff. Helm Written Stmt. at 8. The
representative said that he would call Matrix to find out why
Helm was laid off, but when Helm spoke with him later, he was
"hostile"[15] and told her that the layoff was simply a regular

---

 [14] In her opposition to Matrix's Motion for Summary
Judgment, Helm claims that "Ms. Helm, a female, is the only
Foreman that Mr. Shimp can recall selecting for layoff." Pl.
Memo. in Opp. to Def. Mot. Summ. Judg. at 15, 32. For this
assertion Helm relies on a confusing exchange in Shimp's
deposition, id. at 15: "Q. Would you be -- would you lay someone
off who had worked as a foreman before for you, would lay
somebody off who had not worked as a foreman? A. It has happened.
Q. And can you tell me approximately how many times that's
happened over the past two years? A. No. It's not something that
I remember. Q. Do you remember any specific instance where that's
happened? A. Only the one at hand. Q. And which one would that
be? A. Ms. Helm." Shimp Dep. at 20.  In the penultimate question
in this exchange, the lawyer's reference to "that" appears to
relate back to the first question, in which the attorney asked
Shimp whether he would both lay someone off "who had worked as a
foreman before for you" and "who had not worked as a foreman."
Because the initial question asked for a response to two opposite
situations, it is impossible to know what Shimp meant when he
said "that" happened only to Helm.

 [15] At her deposition, Helm said that he was not
defensive and that "nonchalant" would be a better descriptor of
his demeanor. Helm Dep. at 163. Nonetheless, although the
behavior of the Union representative helps us to understand
(continued...)

layoff due to lack of work. Id. at 8-9. See also Helm Typed Stmt. at 1; Helm Dep. at 133-134. Notably, Helm did not file a formal grievance with the Union nor did she inform the Union that she believed she had been discriminated against because she is a woman. Helm Dep. at 132, 136. Other co-workers were surprised that she was laid off and wanted to know whom Helm "piss[ed] off." Helm Typed Stmt. at 1; Helm Dep. at 116.

### G.   **Who Decided To Lay Off Helm?**

Helm does not know who decided to lay her off. Helm Dep. at 118.  She testified as to her belief that Lynch had "an influence" over who was placed on the layoff list but she does not know whether he had the power to do it. Id. Although Helm acknowledged that "they [Matrix] can layoff [sic] who they want," she claimed that she was laid off because "Phil Lynch made this change happen." Helm Written Stmt. at 7. After her layoff, Helm heard that Lynch and Shoeman took "credit for seeing that [she] was let go" and were "'gunning'" for her. Helm Typed Stmt. at 2. However, she has presented no evidence other than her own

---

[15] (...continued)
Helm's experience, it has nothing to do with her claims against Matrix.

conjecture[16] that Lynch, Shoeman, or anyone else actually exerted any influence over Shimp's decision to lay her off. Rather, the evidence shows that Shimp alone selected the people to be laid off "on a random and neutral basis." Pl. Opp. Ex. J at 2. <u>See also</u> Shimp Dep. at 46, 65.

From Maginski, Shimp learned that Matrix needed to reduce its work force by six, and he complied with Maginski's demand on January 11, 2007. <u>Id.</u> at 58-59.  Shimp, who said "I like Ms. Helm," took no pleasure at all in laying her off.   <u>Id.</u> at 141-42.   However, he alone bore the burden of choosing the electricians Matrix would lay off. Although any Matrix employee could voice an opinion about who should be laid off,[17] no one influenced Shimp's decision to lay off Helm -- as he put it, it was "[s]trictly my decision."   <u>Id.</u> at 45-46. Sometimes, Shimp chose people to lay off because they were not performing adequately. <u>Id.</u> at 43-44. But on January 11, 2007, Shimp chose

---

[16] <u>See</u> Pl. Opp. at 17 ("[I]t <u>appears</u> that Messers Maginski, Shuman [<u>sic</u>], Lynch, and any Foreman <u>may provide input</u> into who is laid off.") (emphasis added); <u>id.</u> at 41 ("In fact, it is incredible to believe that neither Messers Maginski, Shuman [<u>sic</u>], nor Lynch--all in positions <u>above</u> Mr. Shimp--would not have input in layoff decisions.").

[17] More specifically, Shoeman has suggested people for layoff in the past but did not voice an opinion about Helm. Shimp Dep. at 101.

the people to be laid off for "no reason" because "everybody was equal" and "[a]ll [were] top quality people." Id. at 47-48. Because the Union electricians have roughly the same basic qualifications, Shimp did not distinguish among the layoff candidates on that basis. Id. at 47, 89-90. Helm agrees that the electricians from the Union Hall "have the same qualifications . . . pretty much," but she had more nuclear facility experience than some of the people who survived the layoff. Helm Dep. at 131-132.

###    H.    <u>Did Shimp Discriminate Against Helm?</u>

At Shimp's deposition, Helm's attorney assured Shimp that "nobody has alleged that you [speaking to Shimp] personally have discriminated against Ms. Helm."  Shimp Dep. at 3.  At her deposition, Helm admitted that she "got along" with Shimp. Helm Dep. at 127. In addition to absolving Shimp of discrimination -- explicitly through her able counsel and implicitly through her own statement -- Helm has presented no evidence that Shimp himself discriminated against her or exhibited any invidious conduct toward her.

Shimp knew that Matrix had "policies against discrimination, harassment in the workplace" but hadn't read them

-23-

or gone to any training seminars about discrimination. Shimp Dep. at 20-21.  When asked specifically about "gender discrimination," Shimp did not know what that was, but he indicated an awareness of sexual discrimination in the workplace. Id. at 21-22 ("Q. Do you have an understanding...of what would be discrimination in the workplace? A. Yes. Q. And can you tell me...what your understanding is? A. Sexual or offensive? There's numerous."). Furthermore, Shimp would have been concerned "if [he] knew that somebody in a supervisory role [at Matrix] had a problem with women in the workplace." Id. at 49.

### I.   Helm's Work Since Her Layoff

After her layoff from Matrix, Helm returned to the Union Hall and signed the books to show that she was available to work. Helm Dep. at 143-44. At the beginning of February 2007, Helm had a one-week job with Berkowitz Glass. Id. at 138-39. She might have stayed at Berkowitz for two weeks, but she had EEOC meetings scheduled and left the job after the first week to attend those meetings. Id. at 140-41. She did not ask the EEOC to reschedule the meetings because they were more important to her than continuing on the Berkowitz job. Id. at 142. In April of 2007, she began working on a two-week job at the Borgata casino

in Atlantic City; that short-term job became permanent and she

was still working at the casino on the date of her deposition,

February 7, 2008. Def. Ex. G; Def. Ex. H at 13; Helm Dep. 139-

140, 142.[18] Other than the Berkowitz Glass job, Helm did not get

any other work between her layoff in January and the casino work

in April of 2007. She collected unemployment during that period.

Helm Dep. at 142-44. Helm has not been hired anywhere as a

foreman since Matrix laid her off. Def. Ex. H at 14.

## II. **Analysis**[19]

---

[18] Helm's referral work history from the Union and her
response to Matrix's interrogatories shows that she was hired by
Calvi Electric, the contractor for the casino job, from April 2,
2007, to March 27, 2008. Def. Ex. G; Def. Ex. H at 13; Helm Dep.
at 142. In her deposition, Helm said that she began working at
the casino at the beginning or in the middle of March. Helm Dep.
at 139.

[19] Summary judgment is appropriate if there is no
genuine issue of material fact and the moving party is entitled
to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In
ruling on a motion for summary judgment, the Court must view the
evidence, and make all reasonable inferences from the evidence,
in the light most favorable to the nonmoving party.  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Whenever a
factual issue arises which cannot be resolved without a
credibility determination, at this stage the Court must credit
the non-moving party's evidence over that presented by the moving
party.  Liberty Lobby, 477 U.S. at 255.
        The moving party bears the initial burden of
proving that there is no genuine issue of material fact in
dispute.  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,
475 U.S. 574, 585 n.10 (1986). Once the moving party carries this
(continued...)

In her complaint, Helm claimed that she was the victim of disparate treatment discrimination, retaliatory discharge, and a hostile work environment. Matrix has moved for summary judgment on all of Helm's claims, and Helm moved for partial summary judgment on two of Matrix's defenses. Matrix also moved for leave to submit a reply brief.

All of the plaintiff's claims arise under Title VII and are thus governed by the familiar burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 522 (3d Cir. 1992). For each of her claims, Helm must first establish a prima facie case of discrimination.  The burden then

---

[19] (...continued)
burden, the nonmoving party must "come forward with 'specific facts showing there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).  The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions.  Trap Rock Indus., Inc. v. Local 825, 982 F.2d 884, 890 (3d Cir. 1992); Fireman's Ins. Co. of Newark v. DuFresne, 676 F.2d 965, 969 (3d Cir.1982).  It is not enough to discredit the moving party's evidence, the non-moving party is required to "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Liberty Lobby, 477 U.S. at 257 (emphasis in original). A proper motion for summary judgment will not be defeated by merely colorable or insignificantly probative evidence. See Liberty Lobby, 477 U.S. at 249-50.  Also, If the non-moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas, 411 U.S. at 802. Finally, the plaintiff has an opportunity to prove by a preponderance of the evidence that the employer's nondiscriminatory reason is pretextual. Id. at 804; Texas Dep't Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). At this third phase, Helm's burden of showing pretext merges with her ultimate burden of proving that "the defendant intentionally discriminated against the plaintiff." Burdine, 450 U.S. at 253. See also id. at 256. Helm may show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id. at 256. See also Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)

The McDonnell Douglas framework "serves to bring the litigants and the court expeditiously and fairly to [the] ultimate question" of whether Matrix intentionally discriminated against Helm. Burdine, 450 U.S. at 253. In other words, that framework helps courts determine whether discriminatory reasons motivated an employer to take an action against an employee.

We will first address Helm's claim for disparate treatment and then turn to her claims for retaliation and hostile work environment, respectively.

### A.   Disparate treatment

### 1.   Prima Facie Case

To establish a prima facie case of sex discrimination in employment under a disparate treatment theory, a plaintiff usually must show that "(1) she is a member of a protected class[20]; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) similarly situated persons who are not members of the protected class were treated more favorably, or that the circumstances of her termination give rise to an inference of discrimination." Red v. Potter, 211 Fed. Appx. 82, 83 (3d Cir. 2006) (quoting Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999)). See also Massarsky v. General Motors Corp., 706 F.2d 111, 118 (3d Cir. 1983) ("a plaintiff alleging a discriminatory layoff need show only that he is a member of the protected class and that he was laid off from a job for which he was qualified while others not in the

_____

[20] The parties do not dispute that Helm is a woman and a member of a protected class under Title VII.

protected class were treated more favorably"). Although courts often use these factors, it is not a rigid formula. E.E.O.C. v. Metal Service Co., 892 F.2d 341, 347 (3d Cir. 1990). More generally, Helm can establish her prima facie case by offering "sufficient evidence . . . such that the court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons." Id. at 348. The burden-shifting framework, beginning with the prima facie case, offers the plaintiff an indirect way to prove that the employer acted because of discriminatory reasons. Causation is thus the central question of the prima facie inquiry. See Sarullo v. U.S. Postal Svc., 352 F.3d 789, 798 (3d Cir. 2003).

        The parties do not dispute that Helm was a member of a protected class, that she was qualified for the position from which she was laid off, or that her layoff was an adverse employment action. In its motion for summary judgment, Matrix claims that Helm was not qualified for transfer at the time of her layoff. In addition, Matrix argues that Helm cannot raise an inference of discrimination or show pretext because (1) she was treated similarly to the male electricians Matrix laid off, and (2) Helm absolved Shimp, the only decision-maker, of discrimination. In her response to Matrix's motion, Helm claims

-29-

that she was qualified to transfer to a refinery, after completing a short refresher course, and that the evidence is sufficient to show an inference of discrimination and pretext. Because we agree with Matrix, we will grant the defendant's motion for summary judgment.

### a.   <u>Qualified For The Position</u>

The parties do not dispute that Helm was qualified for the position from which she was laid off, a journeyman electrician with occasional stints as a foreman. However, the parties disagree regarding whether Helm was qualified to transfer to a position at a refinery for which she needed a South Jersey chemical card.  Shimp stated that Matrix does not transfer people to refineries without a valid chemical card, and Helm claimed that it is industry practice to give employees time to take a refresher course to employees who once had a chemical card.

When determining whether an employee is qualified for a position, courts should "focus on the qualification the employer found lacking." <u>Ezold</u>, 983 F.2d at 528 (concluding that a district court "impermissibly substituted its own subjective judgment" for the employer's regarding an employee's qualifications, <u>id.</u> at 512-513). <u>See also</u> <u>Simpson v. Kay</u>

Jewelers, 142 F.3d 639, 647 (3d Cir. 1998). The plaintiff has to show that she satisfied the employer's criteria or that the employer did not actually use those criteria. Id.

Here, Helm challenges Matrix's refusal to transfer her to another facility. She does not dispute her lack of welder qualifications but does claim that Matrix should have transferred her to a refinery because she could have updated her South Jersey chemical card with a two-hour class. With regard to Helm's qualifications to transfer to a refinery job, she presents no evidence to contradict Shimp's statement that Matrix does not transfer employees to work at a refinery without a South Jersey chemical card. Because we must evaluate her qualifications for a job based on the employer's stated qualifications, the industry standard has no bearing on our analysis. At the time of her layoff, it is undisputed that Helm did not have a valid South Jersey chemical card, and thus she was not qualified under Matrix's standards for transfer to a refinery. Therefore, to the extent that her claim is based on Matrix's refusal to transfer her, we will grant summary judgment in Matrix's favor on this factor alone. Nonetheless, because she was qualified for the position from which she was laid off, we will extend this analysis.

b.   **Adverse Employment Action**

For discrimination claims under Title VII, an "adverse employment action" is one that is "'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997), abrogated on other grounds by Burlington Northern & Santa Fe R.R. v. White, 548 U.S. 53, 67 (2006)). It usually "inflicts direct economic harm" and "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761-62 (1998).

Helm's layoff is clearly an adverse employment action. Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 288 (3d Cir. 2001). However, none of Helm's other complaints regarding her treatment while at Matrix rises to this level. Lynch's mocking of Helm in front of her co-workers, taking hours from her crew, complaining about her to Shimp, and unsuccessfully attempting to interfere with her appointment as foreman are not "significant change[s] in employment status," nor did any of

-32-

these inflict direct economic harm. The same is true for
Shoeman's comment that Helm has a big mouth. Therefore, the only
adverse employment action for which Helm can recover is her
layoff.[21]

### c.   <u>Inference of Discrimination</u>

In a Title VII employment discrimination case, "the
central focus of the <u>prima facie</u> case is always whether the
employer is treating some people less favorably than others
because of their race, color, religion, sex, or national origin."
<u>Sarullo</u>, 352 F.3d at 798 (internal quotations omitted). Under the
<u>McDonnell Douglas</u> framework, "a <u>prima facie</u> case . . . raises an
inference of discrimination only because we presume these acts,
if otherwise unexplained, are more likely than not based on the
consideration of impermissible factors." <u>Pivorotto</u>, 191 F.3d at
352.[22] In other words, the burden-shifting scheme outlined in
<u>McDonnell Douglas</u> is intended to locate a causal connection --

_____

[21] Helm appears to have conceded this limitation in her
opposition to Matrix's motion for summary judgment. <u>See</u> Pl. Memo.
Opp. to Def. Mot. Summ. Judg. at 25 (listing only the layoff in
discussing the third element of Helm's <u>prima facie</u> case).

[22] To raise an inference of discrimination, Helm does
not have to show that Matrix replaced her with a man because the
Supreme Court has not described the fourth element of a <u>prima
facie</u> case so narrowly.  <u>Pivorotto</u>, 191 F.3d at 347, 352.

which Helm must prove -- between impermissible behavior toward Helm and an adverse employment decision. <u>See</u> <u>Sarullo</u>, 352 F.3d at 798. It is often difficult for a plaintiff to directly prove causation, so the Supreme Court developed this framework as a stand-in for causation.

### i.   <u>A Non-Discriminatory Decision-Maker</u>

In this rather unusual case, the plaintiff has herself excused the only decision-maker involved in her layoff from any discriminatory animus or conduct.  More importantly, there is <u>no</u> affirmative evidence that Shimp was discriminatory or that Lynch or Shoeman in any way influenced him, or that Helm's complaint to Shimp about Lynch's "helper" comment[23] (or any other unpleasant facts) had anything to do with Helm's sex or his decision to lay her off.  On such a record, Helm simply cannot raise an inference of discrimination.

This odd set of circumstances bears some resemblance to <u>Sarullo</u>, in which the plaintiff claimed that his employer, the U.S. Postal Service, discriminated against him, <u>inter alia</u>, because of his national origin, specifically his Native American

---

[23] There is no evidence that Helm's other complaints to Shimp about Lynch were related to her sex.

heritage.  Sarullo, 352 F.3d at 791, 798. Our Court of Appeals clarified that Sarullo did not need to establish disparate treatment -- that is, that the Postal Service treated some non-Native Americans better than him -- but he did have to establish a causal nexus between his derogatory treatment by co-workers and supervisors and the Postal Service's action in terminating his employment. Id. Much to the point, the Sarullo decision-maker (the person who actually terminated Sarullo), did not know about the ethnic name-calling that Sarullo endured on the job, and there was no evidence that the decision-maker even knew that Sarullo was Native American. For those reasons, our Court of Appeals determined that this cause of action was "meritless." Id. at 799.

Here, Shimp undisputedly and unilaterally made the decision to lay Helm off.  Although Shimp (obviously) knew that Helm was a woman and, taking the facts in the light most favorable to her, also knew that she had problems with Lynch, there is no evidence that Lynch influenced Shimp's decision. Helm asserts that Lynch "had the ability to influence the layoff list" but offers no proof that Lynch actually did so. Pl. Opp. Memo. at 13.  Helm did not depose Lynch, Shoeman, or anyone else who might have known about Lynch's hypothesized influence on Shimp, and the

-35-

record as it stands provides no rejoinder to Shimp's unqualified testimony that he made the layoff decision alone without outside influence.

Helm cannot defeat this summary judgment motion merely by asserting that Shimp's description of his layoff decision is not believable or that something else could have happened. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57. Rather, Helm "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Id. at 257. Of all of the men with whom Helm worked at Matrix, she has asserted that two of them mistreated her because of her sex, Lynch and Shoeman. Helm has presented no evidence that Lynch and Shoeman had any influence on Shimp's decision. In addition, Helm said she got along with Shimp, and her attorney on the record explicitly exonerated Shimp from discriminatory animus.

In short, based on the uncontested facts the parties submitted, Shimp alone made the decision to lay Helm off, and there is nothing of record to suggest that he had any invidious animus toward Helm. Therefore, the evidence shows no connection between the discriminatory behavior Helm claims to have suffered and Matrix's decision to lay her off. Absent such a link, there

can be no discrimination under Title VII, and Helm's claim must fail.

### ii.  **Lynch's Comments To Helm**

In our Circuit, "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." <u>Ezold</u>, 983 F.2d at 545 (quoted in <u>Pivirotto</u>, 191 F.3d at 359). Indeed, "discriminatory statements . . . made by non-decision-makers or individuals who played no part in the decision are inadequate to support an inference of discrimination." <u>Foster v. New Castle Area Sch. Dist.</u>, 98 Fed. Appx. 85, 87 (3d Cir. 2004) (holding that there was no inference of discrimination in the hiring of a principal where school board members made discriminatory comments but a lower-level administrator decided alone that plaintiff would not be interviewed for the job).

<u>Pivirotto</u> is instructive here.  There the plaintiff was fired from her job at a company where the Chairman and primary shareholder "often told her 'that women were not as dependable or as reliable as men.'" 191 F.3d at 349. Another female employee testified that the Chairman told her that "women were riskier employees than men because they could become pregnant or get

-37-

breast cancer." Id.  The Chairman had the final say on personnel decisions but had primarily delegated those issues to another executive who independently decided to terminate the Pivirotto plaintiff, and the Chairman had ratified that decision. Id. at 348.  Our Court of Appeals held that the Chairman's comments "cannot be seen as evidence of a general hostility to women" and "could not form the basis for a jury verdict in Pivirotto's favor." Id. at 359.

Pivirotto's Chairman is like Lynch here: he made inappropriate remarks to the plaintiff and was in a superior position to the decisionmaker but did not actually make the decision to fire the plaintiff.  In fact, by retaining the final word on major personnel decisions and ratifying the decision to fire the plaintiff, the Pivirotto Chairman was more involved in the decision than Lynch allegedly was here.  Indeed, Helm presents only speculation that Lynch was involved in the decision to lay her off. Furthermore, unlike Lynch's conduct, the Chairman's comments directly displayed his bias against women in his company.  Lynch exhibited no such direct gender bias in telling Helm there was no work for her crew. His labeling of her as a "helper" could be construed as a gender-based comment, especially in a male-dominated workplace, but it does not

-38-

approach the class of unambiguous comments the Chairman made in
Pivirotto.

        A similar situation arose in Ezold, where the plaintiff
law firm associate sued her firm for sex discrimination after it
did not promote her to partner with her contemporaries.  983 F.2d
at 512. Our Court of Appeals rejected Ezold's claim that gender-
biased comments the Litigation Chairman made were sufficient to
establish pretext.  Id. at 514, 545-47. The Litigation Chairman
told Ezold (among other things) that she would have difficulty at
the firm "because she did not fit the ... mold since she was a
woman".  Id. at 545.  In addition, Ezold claimed that this
Chairman made many other sexist comments to her over five years,
including asking her about her "romantic encounters," telling her
not to refer a female attorney to the firm because he had
problems with another female in the Litigation Department, and
instructing female attorneys who were mothers not to travel on
business.  Id. at 546.  Similar to the Chairman in Pivirotto and
Lynch's role here, the Litigation Chairman in Ezold was not a
decisionmaker regarding Ezold's promotion; although he supported
her admission to the partnership at one time, he was no longer at
the firm when it made this decision.  Id. at 547. In Ezold, our
Court of Appeals acknowledged that "proof of a discriminatory

-39-

atmosphere may be relevant in proving pretext since such evidence does tend to add color to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff." Id. at 546 (internal quotes omitted). But taking into account the Litigation Chairman's lack of participation in the action Ezold alleged was discriminatory, our Court of Appeals found that these comments, though "crude and unprofessional," were not sufficient to raise an inference of pretext[24] because they did not evidence a "pervasive hostility toward women." Id. at 547.

Again, the Litigation Chairman's comments in Ezold showed more gender bias than Lynch's comments toward Helm. If the Chairman's comments in Pivirotto and the Litigation Chairman's

_____

[24] Although this section of Ezold addressed pretext, our inquiry for the fourth prong of the plaintiff's prima facie case is analytically similar to the pretext inquiry, and therefore the Court's direction in Ezold is helpful for our consideration of both this part of Helm's prima facie case and her pretext argument. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3d Cir. 2000) ("We recognize that . . . we may possibly conflate the test for causation under the prima facie case with that for pretext. But perhaps that is inherent in the nature of the two questions being asked--which are quite similar. The question: 'Did her firing result from her rejection of his advance?' is not easily distinguishable from the question: 'Was the explanation given for her firing the real reason?'").

comments in <u>Ezold</u> would not suffice for those plaintiffs, Lynch's much less invidious comments cannot make the case for Helm.

Because Lynch was not a decisionmaker and his comments do not show that there was an atmosphere of pervasive hostility toward women at Matrix, Lynch's comment and conduct toward Helm, even if offensive, do not raise an inference that discrimination played a part in her layoff.

### iii. **Helm's Comparator Evidence**

Helm can raise an inference of discrimination with evidence that non-members of the protected class were treated more favorably.  See <u>Metal Service Co.</u>, 892 F.2d at 347; <u>Tucker v. Merck & Co.</u>, 131 Fed. Appx. 852, 855 (3d Cir. 2005). Helm has the burden of showing that "similarly situated persons were treated differently." <u>Simpson</u>, 142 F.3d at 645.

Helm alleges that she was treated differently from other similarly situated electricians because Matrix laid her off and retained male electricians.  In addition, she claims that she was a foreman and points out that it was unusual for Matrix to lay off foremen and retain journeyman electricians.  As discussed above, however, Helm was a journeyman electrician and not a foreman when she was laid off.  Thus, the appropriate comparators

are not male foremen but rather male journeyman electricians, who have fairly equal qualifications according to Shimp and Helm.

Matrix laid off some male journeyman electricians with Helm and retained others. To raise an inference of discrimination, Helm has to show something more than "the fact that some members of one group are sometimes treated better and sometimes treated worse than members of another group." Simpson, 142 F.3d at 646. Here, Matrix treated some male electricians like Helm and laid them off.  It treated others better by keeping them employed.[25] Helm's comparator evidence is thus not sufficient to raise an inference of discrimination.

Finally, because Shimp was selecting six people for layoff among roughly equally qualified electricians, Matrix was not obligated to retain Helm simply because she is a woman and a member of a protected class under Title VII. In this type of

---

[25] Because Helm was not qualified to be transferred to the welding or refinery jobs, the employees transferred to those jobs are not similarly situated. See Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994) ("The similarity between the compared employees must exist in all relevant aspects of their respective employment circumstances.") (cited in Red, 211 Fed. Appx. at 84); Johnson v. Diamond State Port Corp., 50 Fed. Appx. 554, 557 (3d Cir. 2008) (finding that an employee who had special skills that led to a job reassignment was not similarly situated to the plaintiff, who did not have those skills).

situation, "the employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." See Burdine, 450 U.S. at 259 (discussing discrimination in hiring).  As we have often rehearsed, there is no evidence that Shimp's decision to lay Helm off was based on such unlawful criteria.

Because Helm has not presented sufficient evidence to meet her burden to show an inference of discrimination regarding Matrix's decision to lay her off, she has not established her prima facie case.

### 2.   Matrix's Legitimate, Non-Discriminatory Reason

If Helm had shown a prima facie case of disparate treatment, the burden would shift to Matrix to show a legitimate, nondiscriminatory reason for its decision to lay her off. At this stage, the employer's burden is "relatively light"; the employer simply has to "introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes, 32 F.3d at 763.

As the sole decisionmaker regarding Helm's layoff, Shimp knew that one employee had volunteered for layoff and that

-43-

Ramey could be easily transferred due to his special welding skills. Another employee was eligible for transfer to a refinery because, unlike Helm, he had a valid South Jersey chemical card. Following Maginski's orders to reduce the Matrix force at the Site by six electricians, Shimp randomly selected three other electricians, Helm and two of her male colleagues.

To be sure, selecting employees for layoff at random seems an odd business practice, and it may seem with Business School dispassion wiser to choose employees based on their experience or other objective criteria. It is well-established, however, that judging the wisdom of Matrix's random layoff process is not within our charge. As the Eighth Circuit put it so pungently, "[i]t is an employer's business prerogative to develop as many arbitrary, ridiculous and irrational rules as it sees fit. Our only concern is that the employer must apply its rules in an even-handed, non-discriminatory manner." Smith v. Monsanto Chemical Co., 770 F.2d 719, 723 n.3 (8th Cir. 1985) (cited in Maskin v. Chromalloy American Corp., No. 84-1952, 1986 WL 4481, *12 (E.D. Pa. Apr. 14, 1986)).

Here, Matrix's random selection process is a legitimate, nondiscriminatory reason for laying off Helm. Under

the <u>McDonnell Douglas</u> framework, the burden now shifts back to Helm to show that Matrix's explanation was pretextual.

### _____3.   **Pretext**

To establish pretext, Helm must present <u>some</u> evidence by which a reasonable factfinder could either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." <u>Fuentes</u>, 32 F.3d at 764. Under the <u>Fuentes</u> test, the evidence plaintiff proffers must meet a heightened "level of specificity" to survive summary judgment. <u>Simpson</u>, 142 F.3d at 646. Helm must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder <u>could</u> rationally find them unworthy of credence." <u>Fuentes</u>, 32 F.3d at 765 (internal quotations omitted).  A plaintiff is not obliged, however, to present information beyond her <u>prima facie</u> case to survive a motion for summary judgment. <u>Id.</u> at 764.

Helm cites nine reasons for her claim that Matrix's legitimate, non-discriminatory reason for laying her off is pretextual: (1) unbelievable reasons for laying her off (lack of

work at the Site or the A Building job versus evidence that Helm
was the only person laid off from the A Building job and that
Matrix added employees to that job after it laid off Helm); (2)
inconsistent procedures for choosing people for layoff (random
choice versus laying off people who are sub-par employees); (3)
she was the only foreman in Shimp's memory who Matrix laid off;
(4) Matrix's unreasonable and implausible business judgment; (5)
Lynch and Shoeman's stray remarks (regarding her status as a
"helper" and possessor of a "big mouth"); (6) Matrix's decision
to lay off Helm soon after she complained to the whole lunchroom,
including Shimp, regarding Lynch's "helper" comment; (7) Matrix
not following its own "layoff procedure"; (8) Lynch's harassment
of Helm while he was a member of Matrix's management; and (9)
Matrix's "hiding of the decision maker." Pl. Opp. at 28-41.

        We have already rejected several of these points.  Helm
was not a foreman at the time Matrix laid her off.  Lynch and
Shoeman's remarks toward her were not sufficient to establish her
prima facie case and are similarly insufficient to show pretext.
Matrix was perfectly within its rights to randomly choose
employees for layoff. Furthermore, Helm has not shown that Matrix
had inconsistent procedures for choosing employees for layoff.
Instead, when Matrix had sub-par employees they were at the top

-46-

of the layoff list, but when all employees were performing well

(as was the case here) Shimp chose people -- one woman and two

men -- at random. This is not evidence of pretext regarding

Helm's layoff. Rather, Matrix simply had two different approaches

to layoffs for two different scenarios, and the evidence shows

that Matrix followed one of those approaches in laying off Helm.

As we have repeatedly noted, there is also no evidence that

anyone other than Shimp made the decision to lay off Helm.

Thus, on this record Helm's pretext theory simply does

not withstand scrutiny.[26]  Her disparate treatment claim cannot

survive summary judgment.


### B.   Retaliation

To establish a prima facie case for retaliation, a

plaintiff must show that "(1) she engaged in activity protected

by Title VII; (2) the employer took an adverse employment action

against her; and (3) there was a causal connection between her

participation in the protected activity and the adverse

employment action."  Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d

Cir.1995).

---

[26] This is particularly true of the hiring pattern
regarding the A Building job and the timing issue, which we now
discuss in our analysis of Helm's retaliation claim.

-47-

<u>            </u>1.   **Protected Activity**

For the purposes of showing a <u>prima facie</u> case of retaliation, protected activity covers a wide range of behavior that extends well beyond formal complaints and includes informal complaints to management regarding invidious discrimination. <u>Barber v. CSX Distrib. Servs.</u>, 68 F.3d 694, 701-02 (3d Cir. 1995). General complaints about unfair treatment that do not allege such discrimination are not protected activity. <u>Id.</u> at 701.

As evidence of protected activity, Helm points to Diggs's affidavit, in which he states that he heard "Ms. Helm complain to Mr. Shimp about Mr. Lynch on approximately five to six occasions" and that he thought Lynch was "trying to knock Ms. Helm down." Diggs Aff. at 2; Pl. Opp. at 50.  Notably, Diggs did <u>not</u> state that he heard Helm complain to Shimp about gender discrimination, and so this is not evidence of protected activity. Helm also says that she complained to "everyone" in the lunchroom regarding Lynch's helper comment and she is "sure" Shimp was there when she complained because "[h]e was there every day" and she told him "in a general audience-sense." Helm Dep. at 97. Drawing all reasonable inferences in Helm's favor, as we must, we will assume that Shimp heard this complaint.  Although

-48-

Lynch's comment could readily have been devoid of gender bias, we again will give Helm the benefit of the doubt and assume here that it was a gender-related comment.

### 2.   **Adverse Action After Or With Protected Activity**

"Adverse action" for retaliation claims is not limited to those actions that affect the terms and conditions of employment and thus is broader than the "adverse employment action" required for a prima facie case in substantive discrimination claims, such as Helm's disparate treatment claim. Burlington Northern & Santa Fe R.R. v. White, 548 U.S. 53, 64 (2006).  The anti-retaliation provision of Title VII protects employees "from retaliation that produces an injury or harm." Id. at 67.  Helm claims that she suffered an adverse action when Matrix replaced her as foreman on the A Building job, laid her off, and refused to transfer her.  There is no question that Helm's layoff produced an injury and was an adverse action that occurred after her complaint to Shimp regarding Lynch's "helper" comment.  Because this suffices for Helm to establish this prong of her prima facie case, it is unnecessary to decide whether Lynch's and Shoeman's other actions were adverse actions for Helm's retaliation claim.

-49-

### 3.   **Causal Connection**

Helm "may [and indeed does] rely upon a broad array of evidence" to establish a causal connection between her complaint to Shimp regarding Lynch's helper comment (her protected activity) and her layoff. <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 284. Helm points to the time between her complaint and layoff, Lynch's pattern of antagonism, Matrix's inconsistent reasons for Helm's layoff, and Matrix's "change in demeanor" (specifically her replacement as foreman in the A Building job, Shoeman's attitude change, and the efforts of Shimp and Shoeman to "dig up dirt" on Helm).

Again, this case is unusual because Helm absolved Shimp -- Matrix's only decisionmaker regarding her layoff -- of invidious discrimination.  There is also no evidence that Lynch or Shoeman had <u>any</u> impact on Shimp's decision, so their behavior had nothing to do with Helm's layoff. Thus, the only causal linkage that bears more discussion here is the closeness in time between Helm's complaint to Shimp about Lynch's "helper" comment and her layoff.

In <u>Jalil v. Avdel Corp.</u>, 873 F.2d 701, 708 (3d Cir. 1989), our Court of Appeals held that the Title VII retaliation plaintiff established a causal link between his protected

activity and his discharge when the employer fired the plaintiff
two days after the employer received his discrimination charge
from the Equal Employment Opportunity Commission.  More recently,
our Court of Appeals curtailed the impact of its ruling in Jalil:
"if Jalil is to be interpreted as holding that timing alone can
be sufficient, that holding must be confined to the unusually
suggestive facts of Jalil." Robinson, 120 F.3d at 1302. Indeed,
suspicious timing alone "will ordinarily be insufficient" to
create a causal link. Id.

        Our Court of Appeals revisited the issue of timing in
Farrell, on which Helm relies for the idea that "the timing of
plaintiff['s] discharge, three or four weeks after she rejected
the sexual advances of her boss, [was] suggestive of unlawful
retaliation." Pl. Opp. at 53.  In Farrell, the Court admitted
that there appears to be a split in its jurisprudence on this
issue but that the "'split' is not an inconsistency in our
analysis but is essentially fact-based.  Rather, we have ruled
differently on this issue in our case law, depending, of course,
on how proximate the events actually were, and the context in
which the issue came before us." Farrell, 206 F.3d at 279.

        In Farrell, our Court of Appeals specifically did not
determine whether the timing alone would suffice to support the

plaintiff's prima facie case. Id. at 278-79, 280.  Instead, the
Court examined all of the evidence in the record and found that
Farrell made out a prima facie case for retaliation. Id. at 279.
The Farrell plaintiff's direct supervisor made sexual advances
toward her while on a business trip, lied about other executives'
complaints regarding the plaintiff's performance, and was
directly involved in the company's decision to end her
employment.  Id. at 276, 285-86. In addition, the company had
inconsistent reasons for ending Farrell's employment, first
citing an upper management decision to consolidate departments
and then mentioning complaints the plaintiff's supervisor (the
same person who made sexual advances toward her) received about
her.  Id. at 285. Taking into account Farrell's supervisor's
sexual advances, his involvement in the termination decision, the
timing, and the inconsistencies, the Court held that Farrell had
met the causation element of her prima facie case for
retaliation.  Id. at 286.

Having rejected the other reasons Helm raised for
establishing a causal link between her protected activity and her
layoff, we are here left with the timing issue alone.  Under the
jurisprudence of our Court of Appeals, it is not clear whether
timing alone is enough to satisfy the causation element.

Fortunately, the unusual nature of the record in this case relieves us from making this decision. Because Helm absolved Shimp of invidious discrimination and proffers no evidence that he discriminated against her, she cannot show a causal connection between her complaints about Lynch's behavior and her layoff. Therefore, Helm has not established a prima facie case for retaliation.

### C.   **Hostile Work Environment**

Title VII recognizes that women and members of other protected groups experience discrimination in ways that are neither tangible nor economic. Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). Under well-established jurisprudence, Title VII seeks to eliminate some women's experiences of disparate treatment when "work[ing] in a discriminatorily hostile or abusive environment." Id. An employer violates Title VII "when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Id. (internal quotations and citations omitted). However, a plaintiff cannot recover for all

conduct that is "merely offensive." Id. See also Meritor Savings Bank, FSB, v. Vinson, 477 U.S. 57, 67 (1986).

In order to establish a prima facie case for a hostile work environment claim, a plaintiff must establish that (1) she suffered intentional discrimination because of her membership in a protected class; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would have detrimentally affected a reasonable person in the same position; and (5) there is a basis for employer liability. Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006), abrogated on other grounds by Burlington Northern & Santa Fe R.R. Co. v. White, 548 U.S. 53 (2006). In evaluating Helm's claim of a hostile work environment, we must examine the record as a whole, rather than evaluating each incident in isolation. Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149 (3d Cir. 1999).

Unlike Helm's disparate treatment and retaliation claims, for her hostile work environment claim she is not required to show a causal connection between Lynch's objectionable behavior and her layoff. Therefore, the lack of such a causal link, which led to our granting of summary judgment in Matrix's favor on the two claims described above, is not fatal to her hostile work environment claim.

-54-

Matrix argues that Helm cannot establish any element of her prima facie case for her hostile work environment claim. Because we agree with Matrix regarding the second and fourth elements, we will grant summary judgment in Matrix's favor on this hostile work environment claim.

## _____1.   **Intentional Discrimination Because Of Her Sex**

As Helm points out in her opposition to Matrix's motion for summary judgment, Title VII prohibits not only blatantly sexual comments and behaviors but also non-sexual, yet gender-based, conduct. Durham Life Ins., 166 F.3d at 148. The discriminatory treatment Helm received while employed at Matrix is "not sexual by [its] very nature,"[27] and thus we are obliged to engage in a "more fact intensive analysis" than cases where, for example, female employees have been exposed to pornography or sexual propositions. Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 n.3 (3d Cir. 1990), superseded by statute on other grounds.

In her response to Matrix's motion for summary judgment, Helm claims that Lynch did not like women and, as a

_____

[27] Ironically, the only overtly "sexual" conduct in the record is Helm's retort to Lynch's helper comment, when she "told him to wipe that stuff [semen] off his chin." Helm Dep. at 91-92.

-55-

result, subjected her to a hostile work environment when he undermined her authority by (1) taking work from her crew, (2) trying to cause trouble between Helm and Shimp, (3) attempting to replace Helm as foreman, and (4) his helper comment.  Pl. Opp. at 42. On its face, Lynch's helper comment is the only arguably sex-based conduct Helm experienced during her work at Matrix.  Of course, Lynch's behavior does not have to be distinctively sex-based to support Helm's hostile work environment claim; even neutral harassing conduct can support such a claim if gender was a "substantial factor in the harassment" and if Lynch would not have treated a man in the same way. <u>Aman v. Cort Furniture Rental Corp.</u>, 85 F.3d 1074, 1083-84 (3d Cir. 1996).  Helm claims that Lynch did not exhibit any of these behaviors to a male employee at Matrix, and a reasonable jury could therefore infer that gender was a substantial factor in Lynch's harassment of Helm.

In isolation, Lynch's helper comment and Shoeman calling Helm a "big mouth" would not be adequate for Helm to establish this prong of her <u>prima facie</u> hostile work environment case.  Title VII will not give a plaintiff relief for "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."  <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788

(1998) (internal quotes omitted).  In Helm's workplace, the
ordinary tribulations included teasing and joking among
employees.  Indeed, Helm herself verbally slapped Lynch with a
"joke" regarding his alleged sexual activities with a male
supervisor, and given the atmosphere of a construction site,
Shimp was not shocked at all by Helm's commentary on Lynch's
supposed behavior under the desks of his colleagues.  Looking at
the situation as a whole, even if Lynch's comment _was_ gender-
based and _did_ humiliate Helm -- as we must assume -- Lynch's
helper comment is better categorized as an offhand comment or
"simple teasing" and does not rise to the level of cognizable
harassment under Title VII.  <u>See id.</u>  To rise to the level of a
change in the terms and conditions of employment, "conduct must
be extreme."  <u>Id.</u>  To be sure, the law provides Helm with the
same protections in the male-dominated construction industry as
it does a woman in any other field.  But it is difficult for us
to conceive of _any_ workplace in which Lynch's helper comment
would amount to more than simple teasing or a sporadic gender-
related joke.

        Nonetheless, in analyzing Helm's hostile work
environment claim, we must look at the facts as a whole and
cannot examine the helper comment in isolation.  To paraphrase

our Court of Appeals, "[a chorus] cannot be understood on the basis of some of its [parts] but only on its entire performance," with the combined talents of sopranos, altos, tenors, and basses. Andrews, 895 F.2d at 1484. Similarly, we must examine all of Lynch's alleged discriminatory behavior toward Helm.  Listening to the chorus of Helm's complaints, it is within the realm of possibility that a reasonable jury could find that Lynch intentionally discriminated against her because of her sex.

### 2.  **Severe Or Pervasive**

To determine whether harassment is severe or pervasive, we examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris, 510 U.S. at 23.

Lynch's behavior toward Helm -- the only conduct Helm identified as discriminatory[28] -- was not severe or pervasive. None of the incidents of which Helm complained was severe, and

---

[28] Although Helm does not point to Shoeman's "big mouth" comment for her hostile work environment claim, we note that we would not change our analysis if we added Shoeman's comment to the mix.

none of them was physically threatening.  Lynch's "helper" comment allegedly humiliated Helm, but viewed objectively -- and especially in the context of Helm's workplace (as exhibited by her own rejoinder to Lynch) -- that comment is more akin to an offensive utterance than humiliation.  Moreover, Helm said that all of her male co-workers other than Lynch treated her with respect, demonstrating that Lynch's behavior did not have a significant negative impact on her professional reputation. Finally, Helm presents some evidence (her own uncorroborated statements) that Lynch's behavior has had a negative impact on her personally.  But there is little evidence, if any, that Lynch's treatment negatively affected her work performance. He was never successful at replacing her as foreman, Maginski cut short Lynch's attempt to steal hours from Helm's crew, Helm said that all of her other male co-workers respected her, and Lynch's behavior did not have an impact on Shimp's layoff decision. Furthermore, based on her work history since her layoff, Helm appears to continue to be a valuable employee.

        For these reasons, we conclude that Lynch's behavior was not severe or pervasive for the purposes of Helm's <u>prima facie</u> hostile work environment claim.

### 3.   Detrimental Effect On Helm

Our inquiry for the third prong of Helm's <u>prima facie</u>
hostile work environment case is a subjective one: whether the
treatment Helm suffered in Matrix's allegedly hostile work
environment detrimentally affected her.  Helm has presented
evidence that it did.  In her deposition, she claimed that
Lynch's treatment of her during her time at Matrix "affected
[her] career, [her] family, and [her] respectability." Helm Dep.
at 170. In addition, she took Lynch's helper comment as a
deliberate insult and felt humiliated by it.[29] These statements
are not corroborated by other evidence, but Helm's claims about
her own condition are sufficient to establish this prong of her
<u>prima facie</u> case.

### 4.   Detrimental Effect On A Reasonable Person

Helm argues that a reasonable person would be
detrimentally affected by "a male supervisor's attempts [to]
replace her with men, get her in trouble with her General

---

[29] Helm also claims that her layoff and Matrix's
refusal to transfer her detrimentally affected her. Lynch's
conduct is at the heart of her hostile work environment claim.
Because Lynch had nothing to do with her layoff, Helm cannot rely
on the layoff for this part of her claim. The same would be true
if we also considered Shoeman's "big mouth" comment.

Foreman, and refer to her as a male co-worker's 'helper,'" as well as "being replaced, laid off, and refused for transfer." Pl. Opp. at 45.[30]  As discussed above, Lynch was not successful in replacing Helm as foreman or causing her trouble with Shimp.  The detrimental effect, if any, that a reasonable person would experience from Lynch's "helper" comment (or Shoeman's "big mouth" comment) would not rise to the level of detrimental effect cognizable under Title VII.

Helm cannot establish the second or fourth elements of her _prima facie_ case for a hostile work environment.  It is thus not necessary for us to address the issues surrounding Matrix's liability (or lack thereof) for Lynch's behavior.

Because Helm has not established her _prima facie_ case for any of her Title VII claims, and because our analysis is the same for her Pennsylvania Human Relations Act claims, we will grant Matrix's motion for summary judgment and deny Helm's motion for partial summary judgment as moot.

---

[30] See footnote 29, _supra_, regarding her claims that Lynch's behavior led to her layoff.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARIA H. HELM                    :      CIVIL ACTION
                                 :
          v.                     :
                                 :
MATRIX SVC. INDUS. CONTRACTORS   :      NO. 07-4622

<u>ORDER</u>

AND NOW, this 12th day of November, 2008, upon consideration of the plaintiff's motion for partial summary judgment (docket entry # 17) and defendant's response thereto (docket entry # 20), defendant's motion for summary judgment (docket entry # 18) and plaintiff's response thereto (docket entry # 21), and defendant's motion for leave to file a reply brief (docket entry # 22), it is hereby ORDERED that:

1.   Defendant's motion for leave to file a reply brief is GRANTED;

2.   The Clerk of Court shall DOCKET defendant's reply brief, attached as Exhibit A to the defendant's motion for leave to file a reply brief (docket entry # 22);

3.   Defendant's motion for summary judgment is GRANTED;

4.   Plaintiff's motion for partial summary judgment is DENIED AS MOOT; and

5.   The Clerk of Court shall CLOSE this case

statistically.

BY THE COURT:

__S/STEWART DALZELL_____
Stewart Dalzell, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARIA H. HELM                    :      CIVIL ACTION
                                 :
        v.                       :
                                 :
MATRIX SVC. INDUS. CONTRACTORS   :      NO. 07-4622

JUDGMENT

AND NOW, this 12th day of November, 2008, in accordance with the accompanying Memorandum and Order granting defendant's motion for summary judgment, JUDGMENT IS ENTERED in favor of defendant Matrix Service Industrial Contractors, Inc., and against plaintiff Maria H. Helm with each side to bear its own costs.


                              BY THE COURT:


                              __S/STEWART DALZELL_____
                              Stewart Dalzell, J.